may call today's case. All right, it's case number 15-5718, John Treadway v. California Products Corp. Argument not to exceed 15 minutes per side. Mr. DeVault, you may proceed for the appellant. That's it. If it pleases the court, I'm Charlton R. DeVault, Jr. of the Kingsport, Tennessee Bar representing Mr. John Treadway in this appeal of a summary judgment against him in an age discrimination in employment case. I want to reserve five minutes for a rebuttal if it's satisfactory with the court. You may. I also ask that if I start sounding too loud or too low to please advise me and I'll adjust the volume on my end. You're good now. All righty, thank you, Your Honor. In determining how to boil down the problems in this case to an oral argument, I've concluded that the best way that I can initiate the argument to the court is to point out that in this particular case, the district court found all the California Products Corporation and misinterpreted the ADA prima facie case requirements and the reduction in force law which this court has applied to situations in which economic factors require an employer to lay off an individual or individuals. With regard to the replacement issue, that appears to be the main situation in this case that the court, I feel like, misapplied the Sixth Circuit law. In Barnes v. General Corporation and Kroszkin v. First Energy Corporation, this court has held that a discharged employee is replaced when another employee is hired or reassigned to perform the plaintiff's job duties. Now, the defendant, CPC, has argued in this case and the district court appears to have concluded that there was no replacement within the meaning of Sixth Circuit reduction in force and replacement law. It's our position there was no reduction in force, that new employees were hired, in this case, Mr. David Boppel and Mr. Brian Bonzo, and therefore, we don't have a situation where existing employees performed the duties of Mr. Treadway after he was separated from employment. We say there was no redistribution of work among existing employees. New employees were hired and put into some of his territories, so that as a matter of law, the reduction in force considerations don't apply to this case, and you have a situation where under the prima facie requirements, Mr. Treadway was 69. He was performing his job satisfactorily. We don't have any evidence in the record that he was an unsatisfactory salesman or that he had to be disciplined or that there was any evidence of misconduct which would require a comparative analysis. Instead, he was retired or discharged, and younger employees, both existing and new employees, took over all of his territories, so that all the work that he was doing is now being done by younger employees, and we say that that meets the prima facie case in the district court it did not. One of the chief points, and I know this circuit is concerned with employers' references about age or retirement or any references to employees' inability to do a job because of their advancing age, and the district court passed over that, found that the were not evidence of discrimination, whether it was direct evidence or circumstantial evidence, and we respectfully disagree on the basis that the memos that we've discussed in our brief that start with Vice President Knowles' transition meeting notes in September 2009, where he states that the progress salesman living in John City, Tennessee is slated to retire all the way through 2010 when Vice President of Sales and Marketing Dan Cohen stated in June 9, 2010 memo that John Treadway Progress Brands retires to an October 27, 2010 Booker memo where he states that John Treadway will retire at the end of 2010, which of course did not happen. Excuse me, Mr. DeVault, this is Judge Berg. What case law do you rely on that suggests that mentioning the word retirement is akin to or equivalent to mentioning age or in some way or another can be used to infer age discrimination or discriminatory motive? What authority do you have for that? Isn't there authority that goes the other way on that? We acknowledge that the use of the word retirement in isolated incidents has been held not to be evidence of age discrimination, but what we say in this case is that because it was used continuously and repeatedly by corporate executives who had the authority to make these retirement discharge decisions over a period of three years as discussed in our brief, that they chose to use that word and in fact they acted on the written word and their plans, but at the same time were telling Mr. Treadway that he was going to be servicing the Bahama customers for up to six years. The District Court did not address that at all, but we addressed in our brief that in 2010 the same men that were writing these Mr. Treadway is going to be retiring were telling him and Bahamian customers that he was going to be developing business in the Bahamas in the future, would be down there more often to see them, and would be down there sometimes as often as six times a year. Excuse me, sir, this is Judge Berg again. I understand that, but in this case we've got this memo from back in March 2009 where the issue of retirement or semi-retirement, whichever you want to call it, was raised, and so of course there's going to be continuing discussion about that. Now where is there evidence of discriminatory that he was replaced by younger men, both newly hired and existing, and that he was retired? It may be that when I took the case and first briefed it that I thought it was pretty simple and straightforward. The CPC's own memos talk about hiring a replacement, Brian, excuse me, David Vogel, to replace Mr. Treadway in the Carolinas after Mr. Treadway had done his part pursuant to this understanding he had that if he took on an expanded territory he would be allowed to service the Caribbean. It's, you know, the CPC has used the word replacement. The circumstances show replacement. We say that the facts, as they played out, and these memos that the executives were writing to each other support a case of age discrimination, and especially because they misled Mr. Treadway. I know that the district court concluded that despite Mr. Treadway saying that he was relying on what he was told, that he wasn't misled, that it sort of, you know, it was his fault that he was discharged, and we just disagree and think the jury has to make that determination. We understand that we could lose the case, but we think that the facts are strong enough in light of what I call the duplicity of CPC. The district judge didn't think much of my argument that they had altered the language of the 2009 compensation plan to change it from semi-retire, which is the language that Noel Booker shows, to retire and send it to the EOC, and that all during the tenure of employment, Mr. Treadway, they were operating under the original plan and not under the alter plan. The alter plan helps CPC because it comports with their retirement language and all their executive memos. We think that's evidence that they had a hidden agenda, and as this court is aware, when you have a hidden agenda according to Reeves v. Sanderson and Palme and Products, usually the underlying reason is discrimination, and all that is evidence that boils up into pretext mendacity and discrimination under the Sanderson case. How would you respond if you're talking about some kind of underhanded treatment of the plaintiff here? How would you respond to the fact that they did send them a copy of the Caribbean business plan in November of 2011, which references what they call the current plan for him to retire and turn over those Bahamas accounts to Mr. Turmell? And wouldn't Mr. Treadway have been in a position at that point to object if he felt that that plan was somehow or another misleading? And how could it be misleading if he didn't get a copy of that? It would please the court, and I apologize for not for this oral argument. The district court made a mistake. That's not in the record. That statement's not supported in the record. If you look in Mr. Brooker's affidavit, document 32-4, page ID 366, in paragraph 31, he says that he sent this December 14, 2011 formal business development plan to Longo, who was the president, McMiniman, who was the CFO, and Cohen, who was the vice president in charge of sales. He said he drafted the plan based on his discussions with my client. My client says, no, we didn't talk about that. Brooker did not say he sent the plan to my client. My client says in his affidavit he didn't get it. Counsel, this is Judge Boggs presiding. Your first set of time is up, unless you want to use any more of your time, or if my colleagues have any other questions. But if Judge Berg wants to follow up on this, I want to talk about it while it's still fresh. Okay, Judge Berg, you have any further on this point? Well, I think it's fine if he reserves it for his rebuttal. There was an email that appeared to have been sent from Mr. Booker to Mr. Treadway. At least that's what I understood, and I'll double-check here as well. I think if you double-check, you'll find it was sent to these three men. Vice President Booker always sent my client a copy of the original 2009 agreement whenever they extended from 2009 to 2010, and from 2010 to 2011, he sent copies of the original agreement which used the semi-retire language, but I realized that the district court had misread the situation and misread Mr. Booker's affidavit. My client explains in his affidavit he never got anything like this, and Mr. Booker's affidavit does not say he sent it to him. Okay, thank you. All right. Judge Berg, is that satisfactory for now? Yes, I think I understand his point. Okay, thank you. We'll hear from Ms. Waxman. Good morning, Your Honors. May it please the Court, my name is Lauren Waxman, and I represent California Products Corporation, the Appellee in this case. Before I start, I'd just like to follow up on the issue that my colleague was discussing with Judge Berg. In fact, the evidence confirms that Mr. Booker did send the memo to Mr. Treadway. It's a document from the lower court, document 3211, and it demonstrates that Noel Booker forwarded the email that he originally had sent to Mr. Longo, Mr. McMenamin, and Mr. Cohen. He forwarded it mere minutes after he sent it to those individuals. Mr. Treadway also testified at his deposition that he received a in response to that memo didn't tell Mr. Booker that he ever got it wrong or that the plan wasn't for him to retire. Your Honors, this is a case about an individual who testified that he has no idea why his employment was terminated, no idea whether he would still be employed if he was a younger man, and no evidence that shows the reason he was fired was because of his age. Consistent with his testimony, he's failed to put any evidence on the table to suggest that the company terminated his employment because of his age. Instead, he looks for the devil in the details while asking this court to ignore the core, undisputed fact that it was Mr. Treadway himself who put into motion the series of events that led to his departure and which he now claims constitute age discrimination. It is entirely undisputed that in March 2009, when Mr. Treadway was working for Progress Paints, he approached his boss, stated that he wanted to slow down, and the two of them made arrangements for Mr. Treadway to leave his job with Progress. It is also undisputed that Mr. Treadway's departure didn't go according to their plan. Although they talked about the fact that Mr. Treadway would leave his employment with Progress at the end of 2009 and then work for the company as an agent in 2010, that didn't happen. Instead, in August of 2009, California Products, the defendant in this case, purchased the assets of Progress along with its sales force, which of course included Mr. Treadway. After the purchase, the newly expanded company went through several years of restructuring, and Mr. Treadway didn't end up leaving his employment until December of 2011. While he's plainly frustrated that his departure didn't go as he and Mr. Booker initially discussed, there's simply no evidence that the change in plan was due to age discrimination. The evidence in this case shows only that Mr. Treadway didn't end up getting the post-employment deal that he wanted. He wanted to leave his employment and then work for the company as an agent, which would have allowed him to go down to the Bahamas six times a year and call on customers only very close to his home. But the ADEA simply does not guarantee such an arrangement. And the fact that the company decided that it would rather have existing employees cover the Bahamas and a few accounts near Mr. Treadway's home at no cost, rather than incurring a cost of almost $50,000 to have Mr. Treadway cover them, is simply not evidence of age discrimination. All of the evidence in this case shows that California Products willingly hires and employs older workers. At the time California elected to hire the Progress sales force, Progress had a total of 12 salesmen. Six were in their 60s, five were over the age of 50, and one was 49. During the last two years of Mr. Treadway's employment, more than 70% of the company's workforce was over the age of 40. Mr. Treadway has made absolutely no effort to develop any evidentiary record to support his claim that this company harbors discriminatory animus based upon age against anyone. He didn't take a single deposition in this case and didn't serve a single interrogatory. As a result, the only fact that at the time of his termination. But this fact by itself is far from sufficient to establish age discrimination. As we've outlined in our papers, the district court properly granted summary judgment in the company's favor and this court should affirm that ruling for three primary reasons. First, Mr. Treadway has no direct evidence of age discrimination. Second, he's failed to establish a prima facie case under the indirect method of proving age discrimination and finally Mr. Treadway has failed to show that California's actions were a pretext for age discrimination. Counsel, this is Rodgers. Could you proceed to the second of those please? The prima facie case? Certainly, your honor. Mr. Treadway here cannot establish a prima facie case using the indirect method because he's unable to show either that he was replaced or that he was treated less favorably than a similarly situated significantly younger individual. Mr. Treadway has repeatedly disclaimed any reliance on a theory of less favorable treatment which leaves him only with the option to show that he was replaced. Who did his job after he was after he left? At the time of Mr. Treadway's termination, he was responsible for a total of 16 accounts. 13 of those were in Tennessee and Virginia. They went to David Lloyd, an existing employee, and the three Bahamas accounts that he also was responsible for went to Jim Trammell. Those were replaced by two people who were already there? Correct. So they didn't add anybody to replace him? Why isn't that a reduction in force? It's an interesting question, your honor. I don't know that... You either add new people or you reduce the force when somebody leaves unless he wasn't doing anything. Isn't that true? Well, your honor, at the time that he left, he was responsible for such a small subset of accounts that we didn't need to add anyone because there were existing employees that and he wasn't replaced by anybody. Then what did happen? What did happen is he did some work and now some other people are doing it. And if those people are all more than seven years younger than he was, why isn't that a prima facie case? I guess I'm not quite catching that. It isn't, your honor, because this court has made a judgment call that where multiple employees assume the responsibilities of a departing employee, that scenario doesn't give rise to inference of age discrimination in the same way that the hiring of a single employee to replace a departing employee does. The inference isn't there. Is this the equivalent of the line of cases that says that if you have a RIF, you have a different standard for making a prima facie case? Well, there's a line of cases that says that in the RIF context, there's a line of cases that basically discusses the intersection between the concept of a RIF and the concept of a replacement. And what those things say is that... What's the difference? I don't understand the difference. I mean, if you're replaced by people who are already there, then that's a RIF, isn't it? I mean, unless you don't, I mean, I guess I'm having trouble with the terminology. If you work for someone and three people replace you and those people are already doing work and now they're doing more work, that's a RIF, right? Whether you call it one or not, isn't it, or not? I think you're right, your honor. I think that... So you're basically making an argument which is parallel, at least, to a RIF, lower standard kind of argument. Is that right? Sort of, you know... How is it not? I don't know that... I don't know that the facts of the case fit neatly into the concept of a RIF here. Because here we have a unique situation in which it wasn't the employer that sat down and said, we're going to eliminate his position and we're going to redistribute his territories. This is a situation... That has to do with whether it was voluntary or not, which I understand, but that to me is a different issue with respect to the prima facie case of whether he was replaced. You can voluntarily leave and then they replace you with if you voluntarily leave and then they replace you with a one younger person that they've newly hired, you still have an issue about whether it was voluntary or not. But that's a different issue from whether you were replaced by a younger person or not, isn't it? Perhaps I'm not understanding your question, your honor. I'm trying to get at the prima facie case. One element of the prima facie case is that you're replaced by a younger person. And to say, well, that isn't met because he left voluntarily, it seems to be apples and you seem to be talking about two different things. Whether he left voluntarily doesn't have to do with who he was replaced by. Those are different issues, aren't they? Well, yes, those are different issues, your honor. So if I'm asking you a question about whether he was replaced by somebody younger, it's not responsive to say, well, he left on purpose. Is it or is it? I understand, your honor. If he, so I'm asking whether he was replaced by a younger person or whether it was a RIF. I think those are kind of the categories. Or he was replaced by a not younger person, but there's no argument that he was replaced by another person who was close to him in age. So he was either replaced by a younger person or it was a RIF. I don't know. This is Judge Boggs. Are there cases or doctrine that says that everyone who brings a suit either was replaced or RIFed? I'm just asking that because the usual, quote, RIF is you decide we need to save money and then you choose who to fire. And this doesn't smell like that, but Judge Rogers is right that either someone is replaced or you quit doing his work at all. And that's not quite the case here either. So does the doctrine permit you to say this just doesn't fit into either a RIF or a replacement? I think it does, your honor. There are cases in which this court has addressed what an employer has deemed as a single termination and found that an individual wasn't replaced. And the reason that they found that the individual wasn't replaced was because that person's job duties were given to an existing one or multiple existing employees. The court then didn't conclude that because the individual's job duties were redistributed, that scenario was a RIF. What case would you avert? Do you have a citation? You said we have cases that do that. Sure, I have several. Name one or two. Sure. There is the case of Harmon v. Earthgrains Baking Companies. In that case, the individual left and afterwards an existing employee completely absorbed the departing employee's duties and had to give up some of his duties who went to another manager's desk. Okay, I have that citation. Do you have another one or is that your best one? Nope, I have a couple more for you. I have the case of Lilly v. BTM Corporation 958 F2D 746. Okay. Same situation there. The plaintiff left, duties were spread among existing employees, and the court determined there was no replacement. And then there's the case of Novotny v. Reed Elsevier. That is 291 Federal Appendix 698. It's a gender discrimination case, but the same sort of idea. Okay, we can look at that and see. Thank you. You can proceed. Very good. Your Honor, one point I think that's helpful to know when we're thinking about whether Mr. Treadway established a prima facie case of age discrimination is that sometimes this court holds that where the facts of the case are unique or different, the prima facie test needs to be fiddled with a little bit. It's not the case that the test always needs to be applied mechanically or rigidly. And here to suggest that the hiring of these individuals that Mr. Treadway identifies as replacements gives rise to an inference that the company was discriminating him on the basis of his age respectfully makes little sense. As I was mentioning, Mr. Treadway was the one who put into motion the series of events that led to the hiring of these people. He agreed with Mr. Booker to a scenario in which he would temporarily assume responsibility over certain locations knowing full well that the company was going to hire someone to permanently cover that position. And so to suggest that the company's hiring of that person somehow gives rise to an inference that the company was discriminating against him just can't square. The company made that decision because it was trying to, you know, carry out the plan that it had discussed and frankly because the plaintiff said he was going they had to do something. If you don't mind, I wonder whether that argument doesn't sound more persuasively under the third part of your argument than the second, which is to say under the pretext argument rather than the prima facie case argument. In other words, rather than tinkering and playing around with and modulating the prima facie case, wouldn't it make more sense to just look at that straight on when you're talking about pretext? Sure, I think it fits in either category, Your Honor. The reason I brought it up in the context of the prima facie case is because, you know, we're talking about whether the hiring of I'm just wondering whether it isn't more persuasive under the third category than the second. Perhaps it is, Your Honor. Okay, thank you. As we've, yes, and as we've demonstrated in our brief, Mr. Treadway has put nothing on the table to suggest that the company's actions were a pretext for discrimination. The company elected to terminate his employment based on a determination that it would be more cost effective to have existing employees cover the few accounts for which Mr. Treadway was ultimately responsible than it would be to continue paying him a full salary to cover them. Mr. Treadway hasn't done anything to dispute this explanation or to suggest that the company didn't honestly believe it. Instead, he actually admitted at his deposition that he has no evidence to support his contention that he was fired because of his age. Instead, he conceded that it's simply his belief that because he was the oldest salesman and, quote, replaced by younger employees, the company must have fired him because of his age. This court flatly rejects this type of speculation at the summary judgment stage, and it should do so again here. It's also worth noting, Your Honors, that the hiring of I don't think your time has expired unless either of my colleagues have any further questions. Judge Berg, anything else? Very much, Your Honors. No. No, thank you. All right, thank you. Mr. DeVault, you have five minutes for rebuttal. If it pleases the court, I apologize for the confusion on the November email. I couldn't locate what Ms. Waxman was talking about, but I did see in my client's affidavit, document 36, page ID 516, that Mr. Booker, VP Booker, talked to him before this plan was put out in November 2011 and told him verbally that CPC was not going to honor the agreement anymore. And they had a mild fuss about it. And my client's affidavit says that he was amazed and asked why they thought he'd been working for three years if they weren't going to honor it. He may or may not have gotten a copy of this plan, but he'd already been told that the company wasn't going to honor it. Then, when he had another telephone conference with VP Booker in mid-December, he told him he wasn't quitting and was not retiring when Booker told him that that was it. So, I think it's a credibility issue for the jury to decide when my man was supposed to speak up and object to it because he was told before he got that memo, before it was generated, that the company was not going to honor the original 2009 plan. With regard to the cost effectiveness, Booker was a new hire. He's categorized as a replacement in these memos. He and Mr. Bonzo, who was a replacement hired afterwards, were making $70,000 and $64,000 respectively, plus commissions. My client is being paid $49,000. And we think that's evidence that it was not cost effective to fire my client and replace him with two younger people. That's an issue, we think, for the jury. So, this is Beth Berg again. Can you identify which of these new hires are you arguing is the replacement for Mr. Treadway? The chief replacement is David Bogle, who is listed as his replacement in some of these memos. And he is the one that, when they brought him on board in late November and in December, they instructed my client, Mr. Treadway, to take him to all his customers in South Carolina and North Carolina and introduce him so he could take over. My client did it. He thought this was all part of the plan whereby he would get to service the Bahamas, as he'd been told for three years. And so he did it, and he wasn't complaining about it at that point in time. After he found out that the company wasn't going to honor the plan, after he'd introduced his replacement to everybody, then he tells them that he's not quitting and he's not retiring. Mr. Boswell took over some of the Virginia accounts that Mr. Treadway was servicing up near, up to Culpeper, which is near Washington, D.C. So they were both doing some of the same work that he was doing, Mr. Bogle, more of it, in the Carolinas, which was Mr. Treadway's chief area that he had assumed in order to get to what they say retired to the Bahamas and work down there. It was all part of what my client thought was a plan that went to him working harder, bigger territory, so that he could service the Bahamas on a commissioned basis. There's conflict in CPC's affidavits. My client was going to work on a commissioned basis, not a salary basis, and that's in his affidavit and that's in Booker's affidavit. The McManaman affidavit said it wasn't cost-effective to pay him a salary. Well, they weren't going to pay him a salary. They were going to pay him a commission. They conflicted with each other. Mr. Rogers, can I ask sort of an overall question? What it kind of looks like, tell me where this is not accurate, is that your client wanted to retire from being an employee and basically wanted the Caribbean accounts on a commissioned basis and was actively trying to reach that status, trying to get someone to take his mainland accounts, but he still wanted and thought he had this one person on board to support his getting those Caribbean accounts in the Bahamas. And then it turned out that the new people who were in charge in the new company said, well, we're going to do all of that, but we're not going to give him the Bahamas accounts. And then he was unhappy and ultimately filed suit. But basically what he was unhappy with was not achieving a situation where he had no employment and had a few accounts that he would tend to, most if not all of which were in the Bahamas. Is that basically what's going on? Well, with some tweaking. He never said that he retired, he wanted to slow down, I mean he admitted to that. But there were these memos saying retirement or semi-retirement and they all involved not having him be an employee, is that right? He was basically, after he did what he and they agreed he would do, and did in practice do for three years. They sort of, he had kind of a package deal that he would no longer be an employee, whether you call that retirement or semi-retirement or something else. And that he would however get some Bahamas accounts, maybe some other accounts. And then the other side, while having that be the package, didn't come through and instead said, no, we don't want to do it that way, we want all of the accounts. Is that more or less exactly what's going on? That is one way of describing it, Your Honor. It seems to me that it sounds like they weren't very good to your client, if anything they broke a contract, but it's hard to see how that was, that what they did was a pretext for age discrimination. That's the bottom line difficulty I have with your argument. The contract says it doesn't have to be renewed, it has to be renewed every year, and if not, they had the option of not doing it, and they didn't do it. But we say the reason they didn't do it was age discrimination, they wanted the oldest man. All right, so this is Judge Boggs, just to summarize the violation or non-continuation of the quote agreement, in your view, is age discrimination because it was a pretext for age discrimination? Yes, Your Honor. All right, I think your time's expired, counsel, unless my colleagues have any further questions. That case will be submitted, and the clerk may adjourn court. This honorable court is now adjourned, and Mr. DeVault and Ms. Waxman, you may hang up at this time. And Judge Berg, you can go ahead and hang up, and we'll call you back from the conference room. Thank you very much. Goodbye. Thank you. Samantha, if you'll just let me know that everyone's disconnected, then I will hang up. Yes, ma'am, they have all disconnected. All right, you did a great job, Samantha, I appreciate it. You're very welcome.